UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Stephen A. Martel

v.                                    Civil No. 11-cv-214-JD

Michael J. Astrue, Commissioner,
Social Security Administration

#### O R D E R

Stephen A. Martel seeks judicial review, pursuant to 42
U.S.C. § 405(g), of the decision of the Commissioner of the
Social Security Administration, denying his application for
social security disability insurance benefits.  Martel contends
that the decision of the Administrative Law Judge ("ALJ") is not
supported by substantial evidence, that the ALJ improperly
assessed the opinions of his treating physicians, and that the
ALJ improperly assessed his credibility.  The Commissioner of the
Social Security Administration has moved to affirm the decision.

#### Background

Martel applied for disability insurance benefits on April
13, 2009, alleging a disability since July 16, 2008, due to
pseudogout in his joints, asthma, and left wrist immobility.  He
obtained a GED in 1982 and had worked full time as a machinist at
Summit Packaging Systems and concurrently held a part-time job as
a package handler at Federal Express.  Martel was forty-four
years old when he applied for benefits.

A. Medical records

Martel had a history of pain in his right foot and his left wrist and saw his primary care physician, Dr. Gregory Williams, and other providers for those problems during 2007. Despite pain and surgery on his wrist in May of 2007, Martel continued to work at both his full-time machinist job and his part-time job at Federal Express.

On February 8, 2008, Martel fell on ice while working at Federal Express and injured his ankle and wrist. He saw Dr. Leong on February 12, 2008, because of pain in his right ankle and foot. Dr. Leong assessed a right ankle sprain and wrote a note to excuse Martel from work for the week of February 18, 2008.

Martel saw Dr. Williams on February 27, 2008, for pain in his left wrist and right ankle. Dr. Williams found that Martel's wrist was stiff, swollen, and tender and prescribed Vicodin for pain relief. When Martel went to a follow-up appointment on March 5, 2008, Dr. Williams noted that Martel was not working because of injury to his left wrist and right ankle. Dr. Williams completed workers' compensation paperwork and excused Martel from work until further notice.

On March 18, 2008, Martel saw Dr. Lance Klinger, an orthopedic surgeon, who had previously treated Martel's wrist. Dr. Klinger noted that Martel had aggravated his left wrist

2

problem. Dr. Klinger noted that other treatment had not been successful and discussed wrist fusion surgery with Martel. Martel agreed to that procedure, which was done on April 2, 2008. By the middle of April, Martel had improved, and Dr. Klinger noted that Martel would be able to go back to light duty work in a few weeks. In May, Dr. Klinger noted improvement, increased the weight Martel was allowed to lift up to ten pounds, and allowed him to work "on restrictive hours." Dr. Klinger wrote that he hoped after the next appointment in four weeks Martel could return to "full duty with full hours."

At his appointment with Dr. Klinger on June 6, 2008, Martel reported that he had been working hard with the physical therapist and was slowly beginning to feel better. Martel also reported that he was working half days. Dr. Klinger increased the hours Martel could work to six hours per day and told Martel that he hoped he could return to full duty work in four weeks after the next appointment.

Martel saw Dr. Williams on June 26, 2008, for a follow up on his workers' compensation claim. Dr. Williams noted that Martel took indomethacin daily for ankle and wrist pain and that Martel reported occasional swelling in his ankle. An imaging study of Martel's right ankle done that day showed degenerative change rather than a fracture. Dr. Williams completed paperwork for workers' compensation, stating that Martel should be restricted

3

to light duty work. Notes from the physical therapist indicated that Martel could lift up to thirty pounds with his left arm and up to sixty pounds with both arms.

On July 15, 2008, Martel saw Dr. Klinger for follow up on his wrist surgery. Dr. Klinger noted that Martel was making significant gains with physical therapy. Martel told Dr. Klinger that he had been released from his job at Federal Express.

On July 16, 2008, Martel saw Dr. Christopher Gentchos, another orthopedic surgeon, because of his right ankle pain. Dr. Gentchos noted the ankle injury and that Martel was on crutches and in severe pain due to the ankle. He also noted that Martel had been working full time at Federal Express since May. Dr. Gentchos gave Martel a boot to stabilize the ankle and prescribed antibiotics. Dr. Gentchos also "took [Martel] out of work, as he did not feel that it was safe for him to drive or stand." At a follow-up appointment on July 25, 2008, Dr. Gentchos noted that Martel had responded well to antibiotics and concluded that the ankle problem was due to cellulitis. On August 8, 2008, Dr. Gentchos noted that Martel had been out of work because of his right foot and ankle pain but that Martel reported improvement and requested a note to return to light duty work.

At an appointment with Dr. Klinger on August 26, 2008, Martel reported that this wrist was feeling very good but his ankle was giving him trouble. Examination showed that the wrist

4

was without swelling or tenderness. Dr. Klinger released Martel from work restrictions related to his wrist and allowed him to return to full duty work, with the ability to lift up to seventy-five pounds. Dr. Klinger also noted that Martel remained restricted to light duty work because of his ankle.

Dr. Gentchos saw Martel the next day, August 27, 2008, and diagnosed a fairly severe case of gout in multiple joints. Dr. Gentchos noted considerable swelling in Martel's right foot and ankle and told him he could only offer pain management. Dr. Gentchos kept Martel restricted to light duty work.

On September 11, 2008, Martel saw Dr. Andree Phillips, a rheumatologist, on referral from Dr. Gentchos for an evaluation of his pseudogout symptoms. Dr. Phillips noted that Martel was restricted to light duty work but felt pressure to return to full duty. Dr. Phillips did an examination of Martel's joints, and her impression was that he had pseudogout.

At an appointment with Dr. Williams on September 17, 2008, to discuss his medications, Martel reported that he had been fired from his machinist job. Martel agreed to obtain narcotic medication only through Dr. Williams, who noted that Martel was taking Vicodin more than twice a day.

On September 24, 2008, Martel saw Dr. Gentchos, accompanied by his workers' compensation case manager. Dr. Gentchos noted MRI results and that Martel's ankle was better, although Martel

was still in pain and limped. He also wrote that he hoped Dr.
Phillips would be able to provide treatment.

Martel saw Dr. Phillips on October 23, 2008. He reported
that he had not had any major flare ups since the last visit but
that his ankle remained swollen and painful. Martel told Dr.
Phillips that he might not be able to continue working because of
the physical demands of his job and that he was being pressured
to do full duty work.[1] Dr. Phillips explained that there was no
"disease modifier" for pseudogout and that instead the treatment
was to suppress flare ups of the disease.

On November 5, 2008, Martel saw Dr. Gentchos who noted
Martel's foot and ankle pain due to pseudogout that had
complicated his recovery from the ankle injury. Dr. Gentchos
wrote that he did not think Martel could return to his usual
occupation. He stated that Martel had reached the maximum
medical improvement and that he would be best suited for
sedentary work with occasional walking and minimal lifting. On
November 25, 2008, Dr. Klinger reported that Martel was doing
well regarding his wrist, that he had reached maximum medical
improvement, and that he had no restrictions with respect to his

---

[1]The parties' factual statement is not clear as to why
Martel reported to other physicians that he had lost both of his
jobs before his appointment with Dr. Phillips and yet discussed
with Dr. Phillips whether he could continue to work.

6

wrist.  Dr. Klinger noted that Martel continued to have
restrictions due to his ankle.

Martel saw Dr. Phillips on December 23, 2008.  Martel was
taking Celebrex and reported chronic pain although he had no
increased swelling or pain.  Examination showed normal results,
with his right ankle being no more swollen than his left.

In January of 2009, Martel reported pain in his right ankle
to a physician's assistant in Dr. Williams's practice.  In
February, Martel saw Dr. Gentchos because of pain and swelling in
his Achilles tendon.  Dr. Gentchos diagnosed retrocalcaneal
bursitis with insertional Achilles tendopathy.

Martel saw Dr. Williams in March of 2009 for a follow up on
his workers' compensation status.  Dr. Williams noted the
diagnosis of pseudogout and the lack of success in treating it.
Martel requested stronger pain medication, and Dr. Williams
increased the dose of Hydrocodone-Acetaminophen.  Dr. Williams
wrote that Martel was restricted to light duty work with no
prolonged standing and no lifting, and Martel said that he was
afraid his job at Federal Express would be eliminated.  On
examination, Dr. Williams found that Martel's right ankle was
slightly tender and that he had a limp.  Martel also saw Dr.
Phillips in March of 2009, who noted the Achilles flare up and
changed his medication.

7

Dr. Darlene Gustavson, a clinical psychologist, completed a
consultative evaluation of Martel for his disability application.
Martel explained that he began to have depression after he lost
his full-time job as a machinist in June of 2008 because of his
physical limitations. Based on her evaluation, Dr. Gustavson
concluded that Martel could understand and remember instructions,
could interact appropriately with others, could sustain attention
to complete tasks, and could tolerate stresses common to a work
environment. On July 20, 2009, Dr. Nicholas Kalfas reviewed
Martel's records and concluded that he did not have a severe
mental impairment.

Martel continued to see Dr. Williams through 2009 for pain
caused by pseudogout and for pain in his back and knee. On
October 19, 2009, Dr. Williams completed a workers' compensation
form in which he stated that Martel could not return to work. On
November 20, 2009, Dr. Williams completed a "Medical Statement of
Ability to do Work Related Activities (Physical)." On the form,
Dr. Williams stated that Martel could lift and carry up to ten
pounds; needed to shift at will between sitting, standing, and
walking; would need unscheduled rest breaks; could sit, stand, or
walk for thirty minutes at a time for a total of only four hours
during an eight-hour day; and would need a cane to walk during
flare ups of his ankle pain. Dr. Williams also wrote that Martel
would need to elevate his feet or legs during the day during rest

8

periods, could use his left hand to reach for about three hours, could use his right foot for less than two hours, and would miss work more than three times in a month. The medical reasons Dr. Williams cited for Martel's limitations were his fused left wrist, pseudogout in his right ankle, pain in his back and knee, osteoarthritis, and degenerative joint disease.

During 2010, Martel continued to meet with Dr. Williams for medication review and for workers' compensation paperwork. Martel also had follow up appointments with Dr. Phillips, who continued the diagnosis of pseudogout and found no acute distress on examination.

B. Hearing

A hearing was held before an ALJ on November 7, 2010. Martel testified that he could not do light work in an office because of pain in his right ankle, back, left wrist, left knee, and right shoulder. Because of pain, he was taking fifty milligrams of Percocet daily, and he was also taking Indomethacin. He said that he spent the day lying on the sofa with his leg raised and that on bad days he could not make it to the bathroom.

Martel explained that he experienced flare ups of his symptoms, which he reported to Dr. Williams and Dr. Phillips. He said that usually the flare ups affected one joint at a time but

9

that recently he had gone to the hospital because of severe pain in his back, ankle, and knee and that a fireman had to carry him out of the house. He further testified that at the hospital he was given an IV of anti-inflammatory medication and morphine.

Martel said that he lived with his girlfriend who did all of the housework and shopping and that his brother had also lived with him for the past ten years. Martel also said that when his father lived with them, before his father's death, he did not help to take care of his father. Martel said that on a good day he would go to the grocery store with his girlfriend and help with the dishes.

Martel testified that he had been fired from his job at Federal Express because he could not do the physical labor required for the job. After he lost his jobs he began to suffer from depression because he no longer had a purpose.

## C. Decision

The ALJ issued a decision on December 1, 2010. She found that Martel had severe impairments of an adjustment disorder, pseudogout/chondrocalcinosis, and a shoulder disorder but that he retained the functional capacity to do sedentary work restricted to simple and repetitive tasks. She found that Martel's allegations about the intensity, persistence, and the limiting effects of his symptoms were not credible to the extent they

10

exceeded her finding as to his residual functional capacity. The
ALJ concluded that Martel could not return to his previous work
but that the Grid directed a finding that he was not disabled.
When the Decision Review Board failed to complete its review
within the time allowed, the ALJ's decision became the final
decision of the Commissioner.

## Standard of Review

In reviewing the final decision of the Commissioner in
a social security case, the court "is limited to determining
whether the ALJ deployed the proper legal standards and found
facts upon the proper quantum of evidence." Nguyen v. Chater,
172 F.3d 31, 35 (1st Cir. 1999). The court defers to the ALJ's
factual findings as long as they are supported by substantial
evidence. § 405(g). "Substantial evidence is more than a
scintilla. It means such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." Astralis
Condo. Ass'n v. Sec'y Dep't of Housing & Urban Dev., 620 F.3d 62,
66 (1st Cir. 2010).

Disability, for purposes of social security benefits, is
"the inability to do any substantial gainful activity by reason
of any medically determinable physical or mental impairment which
can be expected to result in death or which has lasted or can be
expected to last for a continuous period of not less than 12

11

months." 20 C.F.R. §§ 404.1505(a). The ALJ follows a five-step sequential analysis for determining whether a claimant is disabled. § 404.1520. The claimant bears the burden, through the first four steps, of proving that his impairments preclude him from working. Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001). At the fifth step, the Commissioner determines whether other work that the claimant can do, despite his impairments, exists in significant numbers in the national economy and must produce substantial evidence to support that finding. Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).

## Decision

The ALJ found that Martel suffered from severe impairments due to an adjustment disorder, pseudogout/chondrocalcinosis, and a shoulder disorder but retained the residual functional capacity to perform sedentary work limited to simple and repetitive tasks. Based on that residual functional capacity, the ALJ found that Rule 201.27 of the Medical-Vocational Guidelines ("Grid"), 20 C.F.R. Part 404, Subpart P, Appendix 2, directed a finding of not disabled. As such, the ALJ found that Martel was not disabled at the fifth step.

Martel contends that the ALJ did not properly assess the medical opinions in the record and should have relied on Dr. Williams's opinion. Martel also contends that the ALJ did not

12

properly assess Martel's credibility and that substantial
evidence is lacking to support the decision that he is not
disabled. The Commissioner argues that the ALJ properly assessed
the medical opinions and Martel's credibility and that
substantial evidence supports the decision.

A.  Medical Opinions

    Martel contends that the ALJ improperly gave Dr. Williams's
later opinions little weight. The ALJ attributes weight to a
medical opinion based on the nature of the relationship between
the medical source and the claimant, the extent to which the
opinion includes supporting information, the consistency of the
opinion with the record as a whole, the specialization of the
source, and other factors, including the source's understanding
of the administrative process and the source's familiarity with
the claimant's record. 20 C.F.R. § 404.1527(d); see also SSR 96-
2p, 1996 WL 374188 (July 2, 1996).

    In this case, the ALJ gave little weight to the opinions
provided by Dr. Williams that Martel was unable to work and his
opinion in November of 2009 that Martel was unable to sustain
even sedentary work on a full time basis. The ALJ noted that
those opinions conflicted with Dr. Williams's earlier opinion
that Martel was able to work but was limited to light duty work
without prolonged standing or lifting and that the record and Dr.

Williams's treatment notes did not show a deterioration in Martel's symptoms that would support the changed opinions.

Martel argues that he was always restricted to part-time work so that Dr. Williams's opinion in November of 2009 that he could not sustain full-time work was not a change from his previous opinions. Nothing in Dr. Williams's notes prior to November of 2009 indicate that he restricted Martel to part-time work. Dr. Klinger did restrict Martel to limited hours of work during June and July of 2008 but as Martel improved those restrictions were eliminated.

The record does not show that Martel was restricted to part-time work for any significant period.[2] Therefore, the ALJ correctly assessed Dr. Williams's November 2009 opinion to be entitled to little weight.

## B. Credibility

Martel first contends that the ALJ failed to follow the procedure provided by SSR 96-7p for assessing the credibility of a claimant's statements for purposes of evaluating his symptoms.[3]

_____

[2] Martel appears to equate "light work" and "light duty work" with part-time work. Neither the record nor the plain meaning of those terms supports that interpretation.

[3] SSR is an abbreviation for Social Security Ruling. "Social Security Rulings are agency rulings 'published under the authority of the Commissioner of Social Security and are binding on all components of the Administration.'" Sullivan v. Zebley, 493 U.S. 521, 532 n.9 (1990) (quoting 20 C.F.R. § 422.408).

14

Specifically, Martel argues that the ALJ failed to find that
there was a lack of objective medical evidence to support
Martel's statements about the limiting effects of his pain, as
required by SSR 96-7p, before assessing the credibility of his
statements. He further argues that because his statements are
supported by the objective medical evidence, no credibility
assessment should have been made. In addition, he asserts that
the ALJ improperly assessed his credibility.

### 1. SSR 96-7p

SSR 96-7p provides a two-step process for evaluating a
claimant's symptoms. The ALJ documented the objective medical
evidence that she found contradicted Martel's statements about
the severity of his symptoms. Therefore, the ALJ followed the
process provided by SSR 96-7p. Cf. Ingle v. Astrue, 2010 WL
5070766, at *4-*6 (D.N.H. Nov. 8, 2010) (ALJ's cursory statement
that claimant's allegations were not substantiated by medical
evidence insufficient to comply with SSR 96-7p).

### 2. Martel's statements

Martel argues that the evidence the ALJ cited to show that
his statements about the severity of his symptoms were not
credible was taken out of context and inaccurate. He also

15

contends that his activities of daily living do not support an
ability to work.

In making a residual functional capacity finding, the ALJ
must consider the relevant evidence but is not required to credit
the claimant's allegations of his functional limitations if they
are unsupported by the medical record and the claimant's
activities. See Frustaglia v. Sec'y of Health & Human Servs.,
829 F.2d 192, 194-95 (1st Cir. 1987). The claimant's credibility
is assessed based on consideration of several factors, which are
the claimant's daily activities, functional restrictions, non-
medical treatment, medications and side-effects, precipitating
and aggravating factors, and the nature, location, onset,
duration, frequency, radiation, and intensity of the pain. See
Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st
Cir. 1986); 20 C.F.R. 404.1529(c)(3). While the ALJ is expected
to consider all of the relevant factors, she need not explicitly
analyze each in the decision. Wenzel v. Astrue, 2012 WL 2679456,
at *7 (D.N.H. July 6, 2012).

In this case, the ALJ considered the relevant factors and
provided an analysis of the evidence to support her credibility
finding. In particular, the ALJ noted that the restriction to
sedentary work addressed Martel's need to avoid physical activity
that could cause flare ups of his symptoms caused by pseudogout.
While other evidence may support Martel's view of his

16

limitations, it is the province of the ALJ to resolve any
conflicts in the evidence. Ortiz v. Sec'y of Health & Human
Servs., 955 F.2d 765, 769 (1st Cir. 1991). Further, the ALJ's
credibility determination is entitled to deference particularly
when, as here, it is supported by specific findings. Frustaglia,
829 F.2d at 195.

## C. Substantial Evidence

Martel contends that substantial evidence is lacking to
support the ALJ's residual functional capacity assessment and her
finding at step five, based on the Grid, that work existed that
he could do. Martel argues that the ALJ misinterpreted his
medical records and drew erroneous inferences from his statements
about his activities of daily living. He also argues that the
ALJ erroneously relied on the Grid at step five because she
included a nonexertional limitation in his residual functional
capacity.

### 1. Residual Functional Capacity

At step four, the ALJ found that Martel retained the ability
to do the full range of sedentary work except that he was limited
to simple repetitive tasks. Martel contends that the record
lacks evidence that he is able to work on a full-time basis and
that Dr. Williams's November 2009 opinion more accurately

17

describes his limitations. The Commissioner points to the evidence that supports the ALJ's finding.

Martel argues that he was limited to working part time because he was working only fifteen hours a week at Federal Express. He contends that the ALJ misunderstood Dr. Gentchos's statement on November 5, 2008, that Martel could not return to his former work and was best suited to sedentary work, mainly seated, to apply to full-time work. As noted above, however, nothing in the record supports Martel's view that Dr. Gentchos had restricted him to part-time work.[4]

Martel also faults the ALJ for taking an overly optimistic view of the evidence. He contends that a more realistic look at the medical evidence and his daily activities shows that he is unable to work. The opinions of Dr. Klinger and Dr. Gentchos support the ALJ's residual functional capacity finding for sedentary work capacity and Dr. William's earlier opinions also support that finding. Dr. Gustavson's evaluation supports the limitation to simple and repetitive tasks and further supports the sedentary work finding. Therefore, although the record and Dr. Williams's later opinions could support a more restricted residual functional capacity, substantial evidence supports the ALJ's finding, requiring that it be affirmed. See Ortiz, 955

---

[4]Dr. Gentchos wrote in a treatment note on July 16, 2008, that Martel "work[s] full time at Federal Express as a handler."

18

F.2d at 769; Evangelista v. Sec'y of Health & Human Servs., 826
F.2d 136, 141 (1st Cir. 1987).

## 2. The Grid

At step five, the ALJ concluded that Grid Rule 201.27
directed a finding of not disabled. Martel contends that was
error because the ALJ's residual functional capacity assessment
included a nonexertional mental impairment, precluding use of the
Grid. Because a vocational expert did not provide evidence on
the availability of jobs that Martel could do, Martel argues that
the record lacks evidence to support the finding at step five.

At step five, the Commissioner has the burden of providing
evidence of specific jobs that the claimant can do. Seavey, 276
F.3d at 5. If the claimant's limitations are only exertional,
meaning related to strength, the Commissioner can satisfy the
burden of proof by using the Grid, "a chart contained in the
Social Security regulations." Id.; see also Heggarty v.
Sullivan, 947 F.2d 990, 995 (1st Cir. 1991). "However, if the
[claimant] has nonexertional limitations (such as mental,
sensory, or skin impairments, or environmental restrictions such
as an inability to tolerate dust) that restrict his ability to
perform jobs he would otherwise be capable of performing, then
the Grid is only a framework to guide the decision." Seavey, 276
F.3d at 5 (internal quotation marks and citations omitted);

19

Heggarty, 947 F.2d at 996 ("If the occupational base is
significantly limited by a nonexertional impairment, the
[Commissioner] may not rely on the grid to carry the burden of
proving that there are other jobs a claimant can do.").

The nonexertional impairment in this case is an adjustment
disorder that limits Martel to simple and repetitive tasks. To
account for that limitation, the ALJ used a Grid rule for
unskilled jobs.[5] A limitation for simple and repetitive tasks is
addressed by the unskilled level of work. Ortiz v. Sec'y of
Health & Human Servs., 890 F.2d 520, 526 (1st Cir. 1989). As
long as other nonexertional limitations do not further interfere
with the claimant's ability to do unskilled work, an ALJ can rely
on the Grid at step five. Id.; see also Zabala v. Astrue, 595
F.3d 402, 410-11 (2d Cir. 2010).

The record does not suggest that the number of unskilled
sedentary jobs would be reduced by the limitation of simple and
repetitive tasks in this case. Therefore, the ALJ's use of the
Grid is affirmed.

## Conclusion

For the foregoing reasons, Martel's motion to reverse and
remand the Commissioner's decision (document no. 10) is DENIED.

---

[5]The ALJ should have provided an explanation of her findings
in relationship to her reliance on the Grid. Her failure to do
so, however, does not require a remand in this case.

The Commissioner's motion to affirm the decision (document no.
11) is GRANTED.  The clerk shall enter judgment accordingly and
close the case.

        SO ORDERED.

                                Joseph A. DiClerico Jr.
                                Joseph A. DiClerico, Jr.
                                United States District Judge

September 12, 2012

cc:  Elizabteh R. Jones, Esq.
     Robert J. Rabuck, Esq.

                              21